Norma E. Ortiz  
Ortiz & Ortiz, L.L.P.  
127 Livingston Street  
Brooklyn, New York 11201  
Tel. (718) 522-1117  
Fax (718) 596-1302  
Counsel to the Debtor

Hearing Date: June 16, 2014  
Time: 10:00 a.m.

UNITED STATES BANKRUPTCY COURT  
EASTERN DISTRICT OF NEW YORK  
---------------------------------------------------------x  
In re

PABLO OQUENDO,

Debtor.  
---------------------------------------------------------x

CASE NO. 14-41986

CHAPTER 13

**OPPOSITION TO THE APPLICATION OF 72634552 CORP.**  
**TO DISMISS CASE AND FOR RELIEF FROM THE AUTOMATIC STAY**

Pablo Oquendo (the "Debtor"), by and through his attorneys Ortiz & Ortiz, L.L.P., hereby responds to the Motion for Relief from Stay ("Motion") filed by 72634552 Corp. (the "Movant"). In support thereof, the Debtor states as follows:

BACKGROUND

1. Acquisition of the Family Home

1. In 1964, when the Debtor was 33 years old, he rented the property known as 183 Lafayette Avenue, Brooklyn, New York 11238 (the "Home") as his residence. Fifteen years later, in or about In January 1979, the Debtor agreed to purchase the Property from the prior owner. At that time, the Debtor resided in the Home with his wife, Luz Oquendo, and their nine children.

2. When the Debtor agreed to purchase the Property, he and his wife decided to place title to the Property in the name of all nine children. At that time, the Debtor was very ill,

and afraid he would not survive his illness. See Affidavit of the Debtor annexed as Exhibit A.

3. The Debtor does not speak English well, and has a third grade education. His wife has a similar level of education and English language speaking ability. He relied upon his oldest child, Lucelenia Reynoso ("Lucy"), to assist him with the purchase of the Home. At the time of the purchase, Lucy was approximately 21 years old and an English speaker. She was employed, and the only child mature enough to assist with the purchase.

4. Lucy was the only child that attended the closing with her parents. At the closing, title to the Home was placed solely in Lucy's name. Upon information and belief, there is no dispute that the Debtor paid the full consideration for the Home.

5. Since Lucy was the oldest child, and the only child that had reached the age of 21, the Debtor, his wife, and Lucy agreed that the deed to the Home would be subsequently transferred to all of the siblings at a later date. The Debtor and his wife placed the deed in Lucy's name under the condition that the deed would be transferred to all of their children, and the Debtor and his wife would be permitted to reside in the Home until their death.

6. Since the 1979, the Debtor and his wife have continued to reside in the Home. Recently, they have had to enter and leave nursing homes and assisted living facilities when their health problems have required constant medical care. But the Home has remained their residence for the last 34 years.

7. The children continued to reside in the Home until they married and or moved away. At the present time, two children still reside with the Debtor and his wife in the Home: Esperanza Oquendo and Carlos Oquendo.

8. The Debtor paid for virtually all of the costs, expenses, and repairs for the

Property since 1979. Lucy has not lived in the Property since 1979, since she married at a young age.

9.      Presently, the debtor is over 80 years old, and is in very poor health. He has severe coronary heart disease, he suffers from bronchial asthma, he is missing one eye, and he is partially blind in the other eye. His wife is also in poor health, and has trouble with her mobility. The Debtor and his wife live on a limited monthly income.

B.   <u>The Secret Sale of the Home</u>

10.     Unbeknownst to the Debtor, Lucy transferred title to the Home to a limited liability corporation (the "LLC") she owned or controlled for no consideration in early 2013. A copy of the deed and Report of Transfer filed with the City Register is annexed as Exhibit B. Almost immediately thereafter, the LLC entered into a contract to sell the Home to the Movant for $600,000. The president of the Movant is Yuvav Golan ("Golan"). Title to the Home was transferred to the Movant in August 2013.

11.     The Debtor asserts that there simply can be no credible dispute about the fact that the Home was sold for significantly less than its worth. Annexed hereto as Exhibit C is a copy of an appraisal of the Home that values the Home at no less than $1.3 million. A recent sale of the house attached to the Home, located at 185 Lafayette Avenue, reveals that the same adjacent property, was sold for $2,900,000. See copy of Report of Transfer filed with the City Register annexed as Exhibit D.

12.     The Debtor suspects that his daughter may have been defrauded or misled by Golan and convinced to the sell the Property at less than fair market value. A quick internet search of Golan's name revealed that on at least one prior occasion, Golan obtained title to a

property, through an entity called Bapaz Adaret Properties Corp., for far less than its value from an 82 year old blind widow. See "Queens Investor Tries to Dupe Elderly Widow Out of Brooklyn Home for $6,000", dated May 12, 2012, from The Real Deal. See also "Sold Out His Blind Mother", dated March 12, 2012, from the N.Y. Post. Copies of both articles are annexed as Exhibit E. The Post article claims that the Supreme Court found that the transaction reeked of fraud and returned the Property to its rightful owner.

13.     The Debtor first learned that Lucy sold the Home in or around September of 2013 when a man approached his daughter Esperanza and told her he bought the Property. When the Debtor questioned Lucy repeatedly about the sale, and she told him she did not sell the house. When the Debtor received legal documents from the Movant, Lucy told him that her lawyer would take care of everything.

14.     The Movant began eviction proceedings in the fall of 2013. The Debtor repeatedly relied on Lucy's advice and representations concerning the sale and the legal proceedings until late 2013. The Debtor did not have the financial ability to hire a law firm until his children pooled the funds necessary to pay a retainer in December or early January 2014.

C.     <u>No State Court Decisions On the Merits of the Debtor's Claims Have Been Issued</u>

15.     On June 25, 2013, the Movant commenced an action in Supreme Court, Kings County, Index No. 11503/2013, seeking declaratory judgment as to the ownership of the Property and to enforce the contract of sale the Movant entered to purchase the Property from Lucy (the "Supreme Court Action"). In that action, the Movant admitted it had knowledge that the residents of the Home asserted an ownership interest in the Home.

16.     The Debtor did not answer the complaint or appear in the Supreme Court Action

because he did not understand the proceeding. When Esperanza received a copy of the documents, Lucy made repeated representations to her and the Debtor that she was taking care of everything and that the Debtor did not need a lawyer. The Debtor believed her: he trusted his oldest child to act in his best interest and did not get independent representation. In fact, at the time the Supreme Court Action was filed, Lucy informed the Debtor that she did not sell the Property. As a result of his failure to appear in the Supreme Court Action, the Debtor was deemed to have defaulted.

17.     However, the Supreme Court Action was not fully litigated and there is no final judgment from the state court deciding the merits of the case. Instead, the Movant stopped prosecuting the Supreme Court Action after Lucy caused the LLC to complete the sale. As a result, there is no decision on the merits in the Supreme Court Action and the case remains open in the court docket. See copy of docket annexed as Exhibit F.

18.     In October 2013, the Movant commenced a holdover proceeding under, Index No. L&T 095664/13, in Kings County Civil Housing Court (the "Housing Court Action") to evict the Debtor and his remaining family members from the Property. It was not until the prosecution of the Housing Court Action that the Debtor and his family stopped believing Lucy's claims that she was taking care of everything. Additionally at this time, Lucy stopped returning the Debtor's phone calls.

19.     In January 2014, the Debtor brought an order to show cause ("OSC") in the State Court Action seeking a stay of the Housing Court Action, to remove the proceeding to state court, for a temporary restraining order to prevent Lucy from dissipating the sales proceed from her unauthorized sale of the Home, seeking a temporary restraining order to prevent the Movant

from transferring the Property to a third party, and seeking permission file a late answer in the Supreme Court Action so that the issue of title to the property could be decided.

20. The OSC was denied without an evidentiary hearing and the Debtor appealed that denial. Upon information and belief, the appeal is still pending. Nevertheless, the denial of the OSC was not a determination of the ownership interest in the Property as between the Debtor, the Movant, and Lucy, and the merits of the Debtor's claims against the Movant and Lucy.

21. The Debtor does not have sufficient funds to pay for the legal fees necessary to defend his and his family's interests in the Home, and to prosecute his claims against the Movant and, unfortunately, his daughter. Five of his children have attempted to undertake the cost of funding his litigation. The Debtor's bankruptcy case was filed to give him a breathing spell and the opportunity to obtain the funds necessary to continue to prosecute his claims.

22. Lucy retained all of the proceeds of the sale and sat back as she watched her parents and siblings face eviction in the height of the winter in January of this year. She has represented to the state court that her parents simply gave her the Home in 1979. At least five of her siblings, and her two parents, will testify that this assertion is a complete fabrication.

23. The Debtor's claims against the Movant and Lucy are not mutually exclusive. Although the claims arise out of the same transaction, the claims are separate and distinct. The Debtor seeks to set aside the sale of the Home on a number of grounds. But if he is not successful, he maintains claims for damages on a number of grounds against Lucy.

## RESPONSE

I.  The Court Should Not Dismiss This Chapter 13 Case

24. The Debtor commenced his Chapter 13 case to allow him to reorganize his affairs and disputes the Movant's contention that his case was filed in bad faith. The Debtor's bankruptcy case was filed before a hearing in the Landlord Tenant Action, but his filing did not stay the action against his wife and the two children that reside with him. The action proceeded before the state court and, upon information and belief, a decision has not yet been issued by the court.

25. The Debtor's filing has been prompted by his limited economic resources to pursue his claims and preserve his Home for the sake of his eight other children and his wife. He has not had the opportunity to fully litigate his claims regarding the Property. In the Supreme Court Action, he deleteriously relied on his oldest daughter and was deemed to have defaulted in the action. Likewise, his appeal to the denial of the OSC is still pending and a decision on the merits has not been reached. In fact, one of the difficulties faced by the Debtor is the cost of prosecuting that appeal: he presently does not have the funds to pay the costs of prosecuting the appeal and may have to prosecute his claims in another manner.

26. This case poses an extraordinary and atypical set of facts under a tragic set of circumstances, and none of the cases cited by the Movant remotely resemble the facts of this case. The Debtor is not trying to indefinitely delay actions against him. The purpose of this bankruptcy filing is not to prevent the Supreme Court Action from reaching a decision, but to give the Debtor a chance to ensure that the merits of his claims are actually decided before he is rendered homeless and his children are stripped of their family's only asset of value.

27. When determining if a debtor filed his petition in bad faith, the Court must review

the totality of the circumstances and make its determination on a case by case basis. In re Tornheim, 239 B.R. 677, 686 (Bankr. E.D.N.Y. 1999). There are many factors the courts consider when determining if a debtor filed in bad faith. These factors include: whether the debtor was forthcoming with the court; whether the debtor accurately stated facts, debts, and expenses; whether the debtor misled the court through fraudulent misrepresentation; how the debtor's actions affect creditors; and whether the debtor has abused the purpose of the bankruptcy code. In re Armstrong, 409 B.R. 629, 634 (Bankr. E.D.N.Y. 2009).

28. None of these factors are present in this case. The Debtor has not filed this action solely as a delay against an unfavorable court ruling but as means of enabling him to use the little resources he has to defend himself and pay his creditors. The fact that his creditors are his lawyers does not diminish the propriety of the claims asserted against the estate. This case does not involve multiple bankruptcy filings, or a bankruptcy filing after a long drawn- out litigation. Instead, the Debtor was betrayed by his daughter, a fiduciary, and the Movant had knowledge of that betrayal when it purchased the Home. All of these events occurred within the last 12 months.

29. The Movant's assertion that this case should be dismissed because the *Rooker-Feldman* doctrine bars the Debtor's use of his bankruptcy filing is similarly misplaced, because there is no final state court judgment on the merits that the Debtor is trying to evade or collaterally attack with this case.

30. The Movant's assertion that the case was filed in bad faith because it involves a two party dispute is similarly misplaced. First, the Debtor's dispute lies with Lucy and the Movant, not just the Movant. Second, the Debtor asserts that this factor alone does not support

such a finding, under the circumstances of this case, and none of the cases cited by the Movant reflect facts remotely similar to the facts of this case.  For example, in In re Plagakis, 2004 WL 203090 (E.D.N.Y., Jan. 27, 2004), the court found bad faith because the debtor filed his petition thirteen minutes before a foreclosure sale, he didn't qualify as a Chapter 13 debtor because his debt was too high, and he executed a quitclaim deed to a third party in an effort to thwart the foreclosure efforts of his secured creditor.   In In re Ward, 423 B.R. 22 (Bankr. E.D.N.Y. 2010), the debtor claimed to own property that had been foreclosed upon months before his Chapter 13 case was filed, and the debtor failed to make pre-confirmation plan payments.  In In re Tornheim, 239 B.R. 677 (Bankr. E.D.N.Y. 1999), the court determined that the debtor did not propose a chapter 13 plan in good faith and tried to delay making any payments by filing numerous plans with "predominantly unadministerable and unconfirmable provisions." Id. at 687.

31. In In re Seltzer, 47 B.R. 340 (Bankr. E.D.N.Y. 1985), the debtor was a financially successful composer, with no debt other than his mortgage, that filed his Chapter 13 case two years into a hotly-contested breach of contract case.  In In re Covino, 245 B.R. 162 (Bankr. D. Idaho 2000), the debtors hid assets from the court in a previous chapter 7 case in an attempt to shield their property from their creditors.  In In re Hall, 216 B.R. 702 (Bankr. E.D.N.Y. 1998), the debtor filed four bankruptcies in a span of two years in an effort to prevent the foreclosure efforts of her secured creditor and took no steps to notify the creditor of the fourth bankruptcy filing.

32. In In re Fooks, 139 B.R. 623, (Bankr. D. Md. 1992), the debtor filed a chapter 13 case to address a debt from the Internal Revenue Service that was not discharged in the debtor's

prior chapter 7 filing. The court found that the filing was designed to evade liability for the debt. In In re Armstrong, 303 B.R. 213 (10th Cir. BAP 2004), the debtor filed a chapter 13 petition in an attempt to modify a confirmed chapter 11 plan and a final state court judgment.

33. In In re Watkins, 2008 WL 708413 (E.D.N.Y., March 14, 2008), the debtor's chapter 13 case was his second bankruptcy case in two years. He filed his second case to prevent the issuance of a warrant of eviction, after he had been given numerous adjournments to amend his chapter 13 plan in his prior case. In In re Griggsby, 404 B.R. 83 (Bankr. S.D.N.Y. 2009), the debtor filed a chapter 13 case after his landlord obtained a warrant of eviction. In In re Baber, 57 B.R. 597 (Bankr. W.D. Va. 1986), the debtor originally filed a chapter 7 petition and converted to chapter 13 after a creditor started an adversary proceeding to deem its debt nondischargeable. In that case, the court found bad faith in the motives for the conversion from chapter 7 to chapter 13 and reconverted the case back to chapter 7.

34. The Debtor's case is different from the foregoing cases for the reasons stated above. He has not, for example, (1) tried to modify a final state court action; (2) his filing did not forestall the Landlord and Tenant Action from proceeding against the three other defendants; (3) he is not trying to evade the payment of debt or abuse the process; (4) he has filed the only plan he could at this stage of his case, in good faith, that commits his disposable income to pay creditors; and (4) the Debtor has not filed multiple bankruptcies. Therefore, based on the totality of the circumstances, the Motion should be denied because the Debtor did not file his case in bad faith.

## II. The Court Should Not Grant Relief from the Automatic Stay

35. The Court should not grant the Movant's request for relief from the automatic

stay at this time.  For the reasons set forth above, the Debtor did not file his bankruptcy case in bad faith and there is no "cause" as defined by 11 U.S.C. 362(d)(1) to deprive the Debtor of the breathing spell he most desperately needs from the Court.

36. Application of the relevant Sonnax factors, set forth in In re Sonnax Industries, 907 F.2d 1280, 1286 (2d Cir. 1990), does not compel the conclusion that the Movant should be permitted to proceed against the Debtor at this time.  Permitting the Movant to proceed with the Landlord Tenant Action will not result in a complete or partial resolution of the issues.  It may render the Debtor homeless, but it will not result in a resolution of the substantive claims pending among the parties.

37. Permitting the Movant to recommence its litigation at this time will greatly interfere with the Debtor's need to reorganize before recommencing litigation.  Although the Debtor agrees that the Landlord Tenant court is the appropriate tribunal to decide a holdover action, the Debtor believes that the Movant wrongfully obtained title to the Home and that issue should be resolved before the Movant is permitted to proceed against him in that tribunal.  The Debtor's filing shall not prevent the action from proceeding against three of the four occupants.  But most importantly, the impact of the stay on the parties and the balance of the harms weigh heavily in the Debtor's favor.

38. If the Movant succeeds in retaining title to the Home, it will have obtained a windfall profit on its $600,000 investment.  There are simply no circumstances under which the Movant will not be made whole under the circumstances of this case.  Any harm resulting from the delay in preventing the continuation of the action will be far outweighed by the harm to the Debtor and his family if the action is permitted to proceed before the Debtor can prosecute his

claims and adequately defend himself against the Movant.

39. The Debtor requests that the Court deny the Motion and provide the parties with the opportunity to engage in discovery of the issues raised herein to reach a final determination of the rights of the parties as to the Home.

WHEREFORE, the Debtor requests that the Court deny and grant such other and further relief as the Court deems just.

Dated: June 12, 2014
       Brooklyn, New York

                                      *s/Norma E. Ortiz*
                                      Norma E. Ortiz, Esq.
                                      Ortiz & Ortiz, L.L.P.
                                      127 Livingston Street
                                      Brooklyn, New York 11220
                                      Tel. (718) 522-1117
                                      Fax (718) 596-1302